

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-26-00216-CR

———————————————————

EX PARTE RAFIQ SAJWANI

---

On Appeal from Criminal District Court No. 4
Tarrant County, Texas
Trial Court No. 1917909

---

Before Kerr, Birdwell, and Bassel, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I. Introduction

This case arises out of a gold-bar scam that involved numerous defendants for whom unreasonable bonds were set despite that the bond-consideration factors do not support the amounts set. *See Ex parte Malani*, Nos. 02-26-00153-CR, 02-26-00154-CR, 2026 WL 2206735, at \*8 (Tex. App.—Fort Worth July 30, 2026, no pet. h.) (mem. op., not designated for publication) (reversing habeas order denying relief on causes of action involving aggregate bonds of $25 million and $30 million after defendants were indicted as part of the gold-bar scam). Appellant Rafiq Sajwani is charged with the offenses of financial abuse of the elderly in an amount of more than $30,000 but less than $150,000 (Count 1) and engaging in organized criminal activity (Count 2). The trial court set bond at $7.5 million on each count; thus, Sajwani initially faced an aggregate bond totaling $15 million.

Sajwani filed a "Motion to Reduce Bond and Application for Writ of Habeas Corpus" seeking to be "discharged from illegal custody and restraint" or alternatively to have the trial court reduce the aggregate bond amount from $15 million to a reasonable amount. The trial court signed an "Order on Pretrial Petition for Writ of Habeas Corpus" granting relief on Count 1 and reducing the bond from $7.5 million to $75,000 "with all previously ordered conditions" but denying relief on Count 2 and leaving the bond set at $7.5 million "plus all previously ordered conditions . . . ,

2

including the requirement that [Sajwani] surrender his passport into the registry of the court pending resolution of the charges against him."

Sajwani now appeals from the trial court's order denying the portion of his pretrial application for writ of habeas corpus that sought a bond reduction as to Count 2.[1] In a single issue, Sajwani argues that the trial court abused its discretion by denying his application seeking a bond reduction on Count 2 because the evidence shows that he has no criminal history, that he is charged with nonviolent offenses, that he has strong family and work ties to the North Texas community, and that there is an "enormous gap" between his financial assets and the bond amount set by the trial court. Unlike in *Malani*, where the State fought to uphold aggregate bonds of $25 million and $30 million, the State concedes in this appeal that the bond of $7.5 million for the organized-crime count is excessive and should be reduced. We agree. We therefore reverse the portion of the trial court's order denying relief on Count 2 and remand this case to that court to set a reasonable, non-excessive bond on Count 2. *See* Tex. R. App. P. 43.2(d).

---

[1]Although Sajwani's brief often refers to the total reduced bail amount of $7,575,000, we construe his brief as not attacking the reduction of the bond on Count 1 because he suggests "a similar reduction on Count [2] from $7.5 million to $75,000."

## II. The Habeas Proceeding

Ashraf Nizar, Sajwani's daughter (Daughter), testified as his sole witness at the habeas hearing.[2] According to Daughter, her parents had been married for thirty-nine years, and together they had three children[3] and three grandchildren. Daughter explained that Sajwani saw his grandchildren every day and that he was "very close to them." Daughter testified that she, her husband, her daughter, and her parents all live together in a house in Allen. Daughter said that the house was valued at "about $360,000"; that they still owed $298,000; and that she and her husband had cosigned the note with Sajwani.

Daughter testified that Sajwani has no criminal history and had never been arrested before his arrest in this case. She said that he had come to the United States from Pakistan in 2018 on an EB-5 Visa, but he later became a legal permanent resident of the United States. Since coming to the United States, Sajwani had returned to Pakistan only once, in 2024. Daughter said that Sajwani was willing to surrender his Pakistani passport to the registry of the court.

Regarding Sajwani's employment, Daughter explained that he had been recruited to work as a sales associate at Malani Jewelers and has been employed by

---

[2]Because the briefs contain similar statements of facts and because the State concedes the necessity for a bond reduction, we borrow, in part, from the State's summary of Daughter's testimony.

[3]One son lives in Canada, and the other daughter and her two sons live five minutes away from Sajwani.

Malani Jewelers for eight years; he works six days a week and earns $1,500 to $1,600 every two weeks; and the total amount of income claimed by the Sajwanis on their 2025 tax return was $48,980. The bank account Sajwani shared with his wife showed a balance of approximately $108,000—much of which was borrowed from Sajwani's sister-in-law for other purposes. In addition to that bank account, Sajwani has two bank accounts in Pakistan—one with a balance of $300 and another with a balance of $12,000.

Daughter testified that Sajwani owns a 2013 Lexus that has approximately 217,000 miles on it. Daughter said that other than the family home in Allen, Sajwani does not own any other homes or property and that he does not own any stocks or investments.

Daughter further testified that under Sajwani's current financial situation, it is not financially possible for him to make an aggregate bond of $15 million.[4] She explained that, taking into account possible financial assistance from other family members, the $120,300 amount in Sajwani's banking accounts is the maximum amount possible that could be pledged to cover ten percent of any bond amount set. If the trial court were to lower the bond amount to one that Sajwani were able to make, Daughter said that she would help ensure that he made every court appearance in this case.

---

[4]The record reflects that Sajwani's attorney, on Daughter's behalf, had engaged in extensive conversations with a bondsman.

Just as in *Malani*, another case that arose out of the same gold-bar scheme, the State relied solely on the affidavit that accompanied Sajwani's arrest warrant. *See* 2026 WL 2206735, at *2; *see also Chavez v. State*, 671 S.W.3d 775, 779 & n.2 (Tex. App.—Fort Worth 2023, no pet.) (noting that because the State relied on two probable-cause affidavits to prove the defendant's alleged offense, "we are similarly limited"). Because the affidavits in both cases are similar, we borrow from *Malani*'s summary of the affidavit, including how the fraud scheme worked:

> That affidavit accumulates reports from numerous law-enforcement entities and details a nationwide network of individuals who have defrauded people of their wealth. Generally, the fraud scheme involved a victim's being contacted by someone who purported to work for a government agency and who would convince the victim that he needed to pay a large fine by either (1) providing the amount in cash or (2) converting his wealth into gold bars. . . . A courier would retrieve the cash or gold bars,[5] and in the latter case, the courier would sell the gold bars to a jewelry store for less than market value. The jewelry store would then melt the gold bars to make inventory, thereby preventing the stolen gold from being traced back to the victim.

2026 WL 2206735, at *2.

But while the State's affidavit is detailed and lengthy—spanning more than ninety pages—it has very few references to Sajwani. The affidavit states that the security guard, who was on duty the day that the search warrant was executed at Malani Jewelers in Richardson, reported (1) that Sajwani was one of only two people

---

[5]As noted in *Malani*, "Several couriers retrieved stolen goods from more than one victim, linking the cases together. And, once arrested and interviewed, at least one individual 'admitted to being a member of a [specific-named] network for moving cash, gold, and silver in an untraceable fashion.'" 2026 WL 2206735, at *2 n.7.

who were allowed to purchase gold from anyone off the street, and most of the gold was purchased by the other authorized purchaser, not Sajwani; (2) the security guard had seen bins being put into Sajwani's car's trunk, and the bins were so heavy that it took two people to carry them; and (3) Sajwani "would courier things in and out of the store and say that he was making bank deposits." The affidavit further states that investigators believed the security guard to be "a credible person based on her being able to give names and tactics unsolicited that officers were previously able to verify through digital forensics from multiple electronic devices seized from suspects and other information told by victims and suspects to investigators."

At the conclusion of the habeas hearing, the trial court refused to reduce the bond for Count 2, stating that it

> believe[d that] the bond ha[d] been sufficiently and appropriately determined at an amount given the gravity of the offense, the flight risk that [Sajwani] poses, strong ties to people outside of this country in Pakistan and Canada, possibly other countries that could aid his flight from the jurisdiction of the [c]ourt, and . . . the gravity of the total loss of the conspiracy weighs heavily on the [c]ourt's mind and merits . . . [$]7.5 million . . . [as] the minimum amount necessary to assure [Sajwani's] continued presence at future settings.

### III.  Burden for Bond Reduction Met

In his sole issue, Sajwani argues that the trial court abused its discretion by setting a $7.5 million bond on Count 2 because it is excessive under the applicable bond considerations. As noted above, the State agrees. We nevertheless set forth our analysis showing that the bond considerations do not support the excessive bond that

7

was set for Count 2. *See Saldano v. State*, 70 S.W.3d 873, 884 (Tex. Crim. App. 2002) ("A confession of error by the prosecutor in a criminal case is important, but not conclusive, in deciding an appeal."); *see also Estrada v. State*, 313 S.W.3d 274, 286 (Tex. Crim. App. 2010) (reiterating *Saldano*'s guidance that "[w]hile the State's confession of error in a criminal case is important and carries great weight, we are not bound by it"). *See generally Ex parte Tiede*, 448 S.W.3d 456, 461–62 (Tex. Crim. App. 2014) (Keller, P.J., dissenting) (setting forth quotes from *Saldano* regarding confession of error and stating that "[t]hese sentiments apply equally to habeas cases").

## A.     Governing Law and Standard of Review

We have previously set forth the law that applies to setting bail[6] and the standard of review that we apply to a ruling on a pretrial application for writ of habeas corpus:

> Bail is excessive if it is "in an amount greater than is reasonably necessary to satisfy the government's legitimate interests." [*Ex parte*] *Hanson*, [No. 02-22-00045-CR], 2022 WL 1496533, at *1 [(Tex. App.— Fort Worth May 12, 2022, no pet.) (mem. op., not designated for publication)] (quoting *Ex* [*p*]*arte Peyton*, No. 02-16-00029-CR, 2016 WL 2586698, at *3 (Tex. App.—Fort Worth May 5, 2016) (mem. op., not designated for publication), *pet. dism'd*, No. PD-0677-16, 2017 WL 1089960 (Tex. Crim. App. Mar. 22, 2017) (not designated for publication)). The government's primary interest, and bail's primary purpose, is to provide a reasonable assurance of the defendant's presence at trial. *Id.*; *see* Tex. Code Crim. Proc. . . . art. 17.01; *Ex parte Vasquez*, 558 S.W.2d 477, 479 (Tex. Crim. App. 1977).

---

[6]Texas law "uses 'bail' and 'bond' interchangeably." *Ex parte Gomez*, 624 S.W.3d 573, 577 (Tex. Crim. App. 2021) (holding that "'bail' and 'bond' as used in Chapter 17 [of the Code of Criminal Procedure] are interchangeable terms").

In setting bail, a trial court is "governed by the Constitution and the following" statutory guidelines:

1. Bail and any conditions of bail shall be sufficient to give reasonable assurance that the undertaking will be complied with.

2. The power to require bail is not to be used to make bail an instrument of oppression.

3. The nature of the offense and the circumstances under which the offense was committed are to be considered, including whether the offense: (A) is an offense involving violence as defined by Article 17.03; or (B) involves violence directed against a peace officer.

4. The ability to make bail shall be considered, and proof may be taken on this point.

5. The future safety of a victim of the alleged offense, law enforcement, and the community shall be considered.

6. The criminal history record information for the defendant . . . shall be considered, including any acts of family violence, other pending criminal charges, and any instances in which the defendant failed to appear in court following release on bail.

7. The citizenship status of the defendant shall be considered.

Tex. Code Crim. Proc. . . . art. 17.15(a) (indentation altered). The Court of Criminal Appeals has identified other factors to be considered as well, including the defendant's work record, his family ties, and his length of residency. *See Ex parte Rubac*, 611 S.W.2d 848, 849–50 (Tex. Crim. App. [Panel Op.] 1981) (listing many factors reflected in the current version of Article 17.15).

We review a trial court's bail determination for an abuse of discretion, viewing the evidence in the light most favorable to the trial court's decision. . . . *Gomez*, 624 S.W.3d [at] 576 . . . . We will not disturb the decision if it is within the zone of reasonable disagreement. *Hanson*, 2022 WL 1496533, at *2. The defendant has the burden to show that it is not within that zone. *Id.*; *see Gomez*, 624 S.W.3d at 576.

9

*Chavez*, 671 S.W.3d at 785; *see also Ex parte McKinney*, No. 02-24-00223-CR, 2024 WL 4562503, at *3–4 (Tex. App.—Fort Worth Oct. 24, 2024, no pet.) (mem. op., not designated for publication). Moreover, setting bond is a fact-driven determination that must be judged on a case's own unique facts. *Ex parte Sanderson*, No. 02-21-00053-CR, 2021 WL 2843830, at *2–3 (Tex. App.—Fort Worth July 8, 2021, no pet.) (mem. op., not designated for publication) (citing *Ex parte Cook*, No. 02-18-00537-CR, 2019 WL 2323643, at *3 (Tex. App.—Fort Worth May 31, 2019, no pet.) (per curiam) (mem. op., not designated for publication)).

### B. Analysis

#### 1. The Nature of Sajwani's Offense and the Potential Sentence

We begin our analysis with the nature of the offense and the possible sentence because those are the "primary factors" we consider in evaluating a bail decision. *See Rubac*, 611 S.W.2d at 849; *Ex parte Hunt*, 138 S.W.3d 503, 506 (Tex. App.—Fort Worth 2004, pets. ref'd). Here, as in *Malani*, the potential prison sentence associated with the alleged offense in Count 2 is lengthy, but the evidence is weak regarding Sajwani's connection to the alleged offense. 2026 WL 2206735, at *3–4.

Sajwani has been charged in Count 2 with engaging in organized criminal activity—a nonviolent offense that is a first-degree felony. *See* Tex. Penal Code §§ 12.32, 71.02(a)(8), (b)(3); *see also Gomez*, 624 S.W.3d at 576 (noting that, in considering the nature and circumstances of the offense, the consideration "implicate[s] the range of punishment"). Although Texas courts have upheld

10

relatively high bond amounts when the crimes at issue involve large quantities of off-the-books cash or are connected to a broader criminal network that suggests the involvement of "monied backers," *see Malani*, 2026 WL 2206735, at *3 (collecting cases), the State's affidavit contains little evidence that Sajwani was a knowing participant in the larger fraud scheme. There is no evidence in the record to show that Sajwani contacted any of the victims or directed any of the couriers. Moreover, as noted in Sajwani's brief, the three things that the security guard said about him "do not even suggest illegal conduct, much less establish probable cause to believe [that he] committed two felony financial crimes." Of course, the State can—and presumably will—produce significantly more evidence at trial. But the record that is before us—and that was before the trial court—is sparse regarding Sajwani's participation in the fraud scheme.

Accordingly, this bond consideration does not weigh in favor of a particularly high bond, much less a $7.5 million one. *See id.* at *4.

### 2.  Sajwani's Criminal History

Sajwani's nonexistent criminal history—another bond consideration—also weighs against a high bond amount. *See* Tex. Code Crim. Proc. art. 17.15(a)(6). The record reveals that Sajwani is sixty-three years old and has never been arrested prior to this case. The absence of any known criminal history militates against a high bond amount. *See Malani*, 2026 WL 2206735, at *5.

11

### 3. Sajwani's Citizenship Status, Community Ties, and Employment Record

We next consider Sajwani's citizenship status, as well as his family ties and work record. *See* Tex. Code Crim. Proc. art. 17.15(a)(7); *Rubac*, 611 S.W.2d at 849–50. The record reflects that Sajwani came to the United States in 2018 on an EB-5 Visa and thereafter became a legal permanent resident. He has returned to Pakistan only once, in 2024, and is willing to surrender his Pakistani passport to the registry of the court.

Additionally, the evidence shows that Sajwani shares his home in Allen with his wife, daughter, son-in-law, and granddaughter and that his other daughter and two grandchildren live five minutes away. Although he has one son who has immigrated to Canada, there is no evidence that Sajwani has travelled there to see him. And Sajwani has worked six days a week at the same job for the past eight years.

These considerations do not support a high bond amount.

### 4. The Government's Interests

The bond conditions related to the government's interests do not support a high bond amount either. *See* Tex. Code Crim. Proc. art. 17.15(a)(1), (5) (requiring court to determine the amount and conditions "sufficient to give reasonable assurance that the undertaking will be complied with" and to consider "[t]he future safety of a victim of the alleged offense, law enforcement, and the community"). The trial court's bond conditions are more than adequate to protect the community's safety and ensure Sajwani's appearance at trial, without the need for an exorbitant bond. *See*

*Malani*, 2026 WL 2206735, at \*6; *see also* Tex. Code Crim. Proc. art. 17.028(b) (noting that, in setting bond, the court should "impose the least restrictive conditions . . . and the [bond] necessary to reasonably ensure the defendant's appearance in court as required and the safety of the community . . . and the victim"); *Ex parte Durst*, 148 S.W.3d 496, 501 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (op. on reh'g) (reversing $3 billion excessive bond, reviewing bond conditions, and noting that "some cases have considered conditions as a means of assuring a defendant's appearance or of protecting the victim and society").

As a preliminary matter, again, the State's affidavit does not show that Sajwani was aware of the nationwide fraud scheme. But even if he had been aware, the record reflects that the initial bond conditions—which the trial court stated would continue—ensure that he cannot participate in the scheme if he is released on bond. Those conditions require Sajwani to, among other things, (1) "[f]ully participate in and comply with the rules and requirements of the Community Supervision and Corrections Department (CSCD) electronic[-]monitoring programs"; (2) not leave Tarrant, Denton, or Dallas County without written permission of the court; and (3) have no contact with co-defendants. The trial court's order denying a bond reduction on Count 2 added the requirement that Sajwani must surrender his passport to the court's registry. Furthermore, Daughter affirmed that she would ensure that Sajwani attended all court settings.

13

The trial court's bond conditions are thus more than adequate to prevent Sajwani from participating in the nationwide fraud scheme while out on bond and to ensure that he appears at trial. Accordingly, the government's interests do not support a high bond amount.

### 5. Sajwani's Ability to Make Bail

Regarding Sajwani's ability to make bail, the State concedes that the record here demonstrates that the family's inability to post a $7.5 million bond supports "a far lesser bond." *See generally Ex parte Howell*, No. 02-26-00134-CR, 2026 WL 2066046, at *3 (Tex. App.—Fort Worth July 16, 2026, no pet. h.) (mem. op., not designated for publication) ("Whether bail is oppressive or not depends [in part] on the defendant's financial circumstances; bail is oppressive if it is set in an amount higher than the defendant can afford for the express purposes of forcing him to remain incarcerated . . . ."). Indeed, the evidence demonstrates that the balances in Sajwani's bank accounts total less than $125,000; that he owes $298,000 on his home; and that he has no other property or investments. The record is clear that he would need to pay at least ten percent of any bond that was set, and despite the evidence of his liquid assets, a $7.5 million bond was set. Even if a bonding company were willing to post such a bond without requiring more than ten percent, *see Malani*, 2026 WL

14

2206735, at \*6, the $7.5 million bond would require him to post $750,000[7]—six times the amount of his liquid assets—in order to be released.

We recognize that the trial court was free to disbelieve Daughter's testimony regarding Sajwani's finances, but it must not speculate without evidentiary support. *See Chavez*, 671 S.W.3d at 789 (reversing $1 million murder bond as excessive and noting in analysis that, "[w]hile the trial court was not required to believe [the defendant's mother's] testimony, there was no evidence to contradict her either" (internal citations omitted)). And apart from the fraud network described in the State's affidavit—an affidavit that barely mentions Sajwani—there is no evidence that he has access to sufficient funds to make a $7.5 million bond.

Regardless, even if Sajwani had an unknown amount of additional wealth, it would not justify the $7.5 million bond here. "Just as a defendant's inability to afford b[ond] does not, in itself, demonstrate that b[ond] is excessive, a defendant's ability to afford [a high bond] in the amount set does not in itself justify b[ond] in that amount." *Malani*, 2026 WL 2206735, at \*7 (quoting *Ex parte Beard*, 92 S.W.3d 566, 573 (Tex. App.—Austin 2002, pet. ref'd)).

Accordingly, we conclude that, like the other bond considerations, Sajwani's ability to pay does not support the $7.5 million bond on Count 2. *See id.* at \*8.

---

[7]This figure excludes the $7,500 that he would need to post for his reduced bond on Count 1.

15

### 6.    Summary

Of the bond considerations, only the flight risk could slightly support a high bond amount, but the weight of that bond consideration is further reduced by Sajwani's willingness to surrender his passport to the trial court's registry. The remaining considerations do not support a $7.5 million bond amount because (1) the nature of the alleged offense is vague, and the evidence is weak; (2) Sajwani has no known criminal history; (3) he has both family and employment ties to North Texas; (4) the trial court's bond conditions are more than sufficient to protect the community; and (5) his liquid assets total less than $125,000, and a large portion of that includes borrowed funds. We therefore sustain Sajwani's sole, uncontested issue.

## IV.  Conclusion

Having sustained Sajwani's sole issue, we reverse the trial court's "Order on Pretrial Petition for Writ of Habeas Corpus" as to Count 2 and remand the case to the trial court to set a reasonable, non-excessive bond on that count.

/s/ Dabney Bassel

Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  August 6, 2026

16